**EUROWORLD OF CALIFORNIA, INC.,
a California corporation, Plaintiff,**

v.

**Rudy BLAKEY, d/b/a Rudy Blakey
Engine Shop, Defendant.**

**No. 81–1261–CIV.**

United States District Court,
S.D. Florida, S.D.

June 24, 1985.

Louis Vernell, Miami Beach, Fla., for plaintiff.

Barry Greenberg, Coral Gables, Fla., for defendant.

## ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief Judge.

The above-styled action came on for trial before this Court on October 16, 1884.

Based upon the entire record in these proceedings, including the parties' closing arguments and memoranda of law, submitted in writing, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the findings of fact and conclusions of law of this Court are:

*Findings of Fact*

1. Plaintiff, Euroworld of California, Inc. (Euroworld), is a California corporation with its principal place of business in Long Beach, California. (T. 14) Euroworld is a wholly-owned subsidiary of Specialty Restaurants Corporation, a large company with restaurants throughout the United States which are primarily theme restaurants, including the 94th Aero Squadron Restaurants of Miami and Fort Lauderdale, and the Rusty Pelican Restaurant of Key Biscayne.

2. Defendant, Rudy Blakey (Blakey), is a citizen of the State of Florida doing business as Rudy Blakey Engine Shop in Miami, Florida. (T. 75) (Plaintiff's Trial Exhibit 10, Rudy Blakey Depo. p. 4.) Blakey has been in the business of overhauling, repairing, and selling aircraft engines for twenty-five years. (T. 75)

3. Euroworld brought to Fort Lauderdale, Florida, aircraft engines and parts which it had purchased from the Morrocan government. (T. 42)

4. In 1979, Blakey went to Fort Lauderdale, Florida, for the purpose of buying aircraft materials and engine parts for use in his engine shop. (Plaintiff's Trial Exhibit 10, Blakey Depo. p. 7.) At that time, Blakey met with Euroworld's representative Robert Craig. (T. 77) (Plaintiff's Trial Exhibit 10, Blakey Depo. p. 8.) Blakey agreed to accept in trade twenty-four 1830 engines from Euroworld in exchange for his providing Euroworld eight "zero-time" (overhauled) 1830 engines. (Plaintiff's Trial Exhibit 10, Blakey Depo. p. 19.)

5. On October 1, 1979, Blakey received the first shipment of engines and signed a written agreement, dated that date, whereby he agreed to deliver to Euroworld eight 1830 engines in zero-time condition in exchange for Euroworld's release to Blakey of twenty-four 1830 engines. (Plaintiff's Trial Exhibit 4.) (T. 22) Within a couple of days thereafter, Blakey received the remaining engines. (Plaintiff's Trial Exhibit 10, Blakey Depo. p. 23.)

6. Blakey contends that his agreement with Euroworld was oral and was based solely upon representations made by representatives of Euroworld that Euroworld would ship to Blakey twenty-four engines which would have no premature failures, were capable of overhaul, and were otherwise normal run-out engines. Blakey further contends that the condition of the engines delivered was not as represented. (Pre-Trial Stipulation, p. 5.)

7. Each of the twenty-four engines was delivered by Euroworld to Blakey's place of business in a sealed canister. (T. 80)

8. Robert Craig, Euroworld's employee, submitted testimony at trial that Blakey knew that neither he nor anyone else at Euroworld had inspected the engines at the time of entering into the transaction with him. (T. 237) Moreover, Craig testified that he advised Blakey that paperwork received by Euroworld with the engines from the Moroccan government reflected that some of the engines were in normal run-out condition and that others had specific problems. Craig testified that Blakey knew that he was relying solely upon these documents when he conveyed to Blakey information pertaining to the condition of the engines. (T. 237) Blakey admits receiving this information. (T. 300)

9. At trial, Blakey testified that he never inspected or asked to inspect the twenty-four engines that he was receiving from Euroworld prior to the time they were delivered to his premises. (T. 81) Blakey further testified that he did not ask to review the engines' logbooks, which typically reflect the condition of the engines, since he believed the engines were too old to still have logbooks. (T-299)

10. Blakey had the opportunity to inspect the engines upon delivery. Blakey admitted that by removing every lid off each of the canisters he was able to substantiate the condition of each of these engines. (Plaintiffs' Exhibit 10, Blakey Depo. p. 28.) (T. 311) Blakey further testified at trial that he did not have to remove the engines from the canisters to ascertain their condition. (T. 310) Moreover, Blakey admitted at trial that a routine preliminary inspection that would show damage to the engine would only have taken ten minutes. (T-304)

11. Although Euroworld delivered the engines to Blakey as agreed in early October 1979, Blakey did not inspect the engines until February 8, 1980. Blakey testified at trial that he inspected the engines in late October 1979. (T. 310) However, this testimony is inconsistent with his earlier testimony in deposition of September 7, 1980. Blakey testified in his deposition that he first inspected the engines when he started to overhaul the first engine which he was to deliver to Euroworld and his work order would indicate the date. (T. 312) Subsequent to Blakey's deposition, the work order was provided to Euroworld and was introduced at trial as Plaintiff's Exhibit 5. (T. 36) That work order indicates that Blakey did not begin to overhaul the first engine until February 8, 1980. (T. 322)

Accordingly, it is evident from his deposition and the work order produced by Blakey prior to trial that he waited four months before inspecting the engines that he had received.

12. Euroworld's president, David Tallichet, testified at trial that in February 1980 he and Robert Nightengale, a representative of Euroworld, met with Blakey at his place of business for the sole purpose of trying to determine a delivery schedule for the eight engines, as Blakey had not yet delivered any engines in accordance with the October 1, 1979, agreement. (T. 28) Specifically, the meeting took place on February 13, 1980. (T. 189) At that meeting, Blakey agreed to supply Euroworld with one engine per month. (T. 29)

13. Both David Tallichet and Robert Nightengale submitted testimony that Blakey never complained about the condition of the 1830 engines at the February 1980 meeting. (T. 31, T. 63, T. 192)

14. Blakey has delivered to Euroworld only two zero-time 1830 engines. On April 16, 1980, Blakey delivered the first overhauled engine to Euroworld. (Plaintiff's Trial Exhibit 5.) (T. 36) Thereafter, on July 2, 1980, Blakey delivered the second overhauled engine to Euroworld. (Plaintiff's Trial Exhibit 6.) (T. 36)

15. After delivery of the second engine, Blakey refused and failed to provide any further zero-time engines to Euroworld, and notified Euroworld that he did not like the deal and was not going to delivery any more engines. (T. 31)

16. On October 10, 1980, Euroworld's representative, John F. Hoover, sent a letter to Blakey and demanded delivery of the remaining engines promised. (Plaintiff's Trial Exhibit 7.) (T. 38)

17. In November 1980, Euroworld received a letter dated November 11, 1980, from Blakey's attorney, Louis Vernell, advising that Blakey would not deliver the remaining six engines still due and demanding payment for overhaul of the two engines, previously delivered. (Defendant's Exhibit 3.) (T. 32)

18. Blakey is in possession of the remaining twenty-two 1830 engines delivered by Euroworld. Blakey has overhauled one of these engines. Of the remaining twenty-one engines, approximately twelve are still in canisters and the rest are disassembled and commingled in boxes. Blakey testified that there is no way he knows of identifying which pieces came out of a particular canister. (T. 326)

19. Euroworld's expert, Raymond Harrott, who has been in the engine overhaul business for forty-two years, presented testimony at trial that the value in 1980 of a zero-time 1830 engine was $20,000 outright sale. (PT. 179, T. 339)

20. Where any finding of fact, in whole or in part, can be deemed a conclusion of law, it shall. Where any conclusion of law, in whole or in part, can be deemed a finding of fact, it shall.

*Conclusion of Law*

1. This Court's diversity jurisdiction is properly invoked, in accordance with 28 U.S.C. 1332(a), as the plaintiff, Euroworld of California, Inc., and the defendant, Rudy Blakey, are citizens of different states.

2. Plaintiff, Euroworld, agreed to provide defendant, Blakey, with twenty-four 1830 engines in exchange for Blakey's return to Euroworld of eight overhauled "zero-time" engines pursuant to a written agreement dated October 1, 1979. This sale or trade-out agreement is governed by Chapter 672 of the Florida Statutes, the Uniform Commercial Code-Sales.

3. The written agreement, dated October 1, 1979, constitutes an enforceable contract.

■ 4. Plaintiff, Euroworld, did not expressly warrant the condition of the twenty-four 1830 engines. Under the code, § 672.313, express warranties can only be created as follows:

(a) Any information of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain....

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the model.

No fact or promise was made by Euroworld's representative, Robert Craig, to Blakey as to the condition of the engines. Rather, Robert Craig testified that he informed Blakey that neither he nor anyone else at Euroworld had inspected the engines. Craig further testified that he advised Blakey what certain documents received by Euroworld, along with the engines, reflected as to the conditions of the engines. At most, the information related to Blakey by Craig constituted an opinion based on document, which does not constitute an express warranty under § 672.313. *See, Royal Business Machines v. Lorraine Corp.,* 30 U.C.C.Rptr. 462, 633 F.2d 34 (CA 7, 1980), at p. 44; *Carter Hawley Hale Stores, Inc. v. Conley,* 372 So.2d 965 (3d D.C.A. 1979); *Lovington Cattle Feeders v. Abbott,* 33 U.C.C.Rptr. 522, 97 N.M. 564, 642 P.2d 167 (1982). In *Royal Business Machines,* the Court stated that the decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment. 633 F.2d at 41. In the instant case, the buyer, Blakey, has had twenty-five years' experience in the engine overhaul industry and is certainly more knowledgeable than Euroworld as to the probability that twenty-four aircraft engines from the Moroccan government would be in normal run-out condition. Blakey even testified that he did not ask for the logbooks because he believed the engines were too old to still have them. (T. 299) Accordingly, and for the above-stated reasons, no express warranty as to the condition of the engines was made by Euroworld to Blakey.

5. Euroworld complied with all the conditions to the agreement between itself and Blakey by delivering to Blakey twenty-four 1830 engines.

6. Blakey accepted the engines delivered by Euroworld and failed to effectively revoke that acceptance. Further, Blakey did not effectively reject the engines. Accordingly, assuming that an express warranty as to the condition of the goods was provided by Euroworld's representative, Blakey waived that defense under Florida law.

7. Under the code, § 672.606, acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity. Blakey's delay in inspecting the engines and advising Euroworld of any problems constituted an acceptance of said engines under the Uniform Commercial Code. First, Blakey had the opportunity to inspect the engines upon delivery and could have notified Euroworld of any problems. Rather, Blakey failed to inspect the engines until February 1980, four months after their delivery. Further, at the February 13, 1980, meeting with David Tallichet and Robert Nightengale, Blakey stated that he would be providing overhauled engines to Euroworld as originally agreed. It was not until the summer of 1980, after Blakey had already delivered to Euroworld two zero-time 1830 engines, that Blakey notified Euroworld that he would not deliver the remaining engines promised. This was nine months after Blakey entered into the written agreement with Euroworld. Accordingly, Blakey's delivery of two zero-time engines to Euroworld, compounded by the nine-month delay before notifying Euroworld of any problems with the engines, signified that Blakey accepted the engines and would fulfill his obligations pursuant to the agreement.

8. Blakey failed to make an effective rejection of the engines as required under the code, § 672.602, by waiting until the summer of 1980 to advise Euroworld of any problems with said engines. His failure to make an effective rejection also constituted acceptance of the goods. *See, Stephens Industry, Inc. v. American Express Company,* 471 S.W.2d 501 (Mo.Ct.App. 1971); *Republic Corporation v. Procedyne Corporation,* 401 F.Supp. 1061 (S.D.N.Y. 1975); *Michael M. Berlin & Co. v. Whinng,* 5 U.C.C.Rptr. 357 (1968).

 9. Blakey failed to make an effective revocation of his acceptance of the engines. Under the Code, Blakey was required to revoke his acceptance within a reasonable time after he discovered grounds for such revocation. § 672.608 states:

> *Revocation of acceptance* must occur within a reasonable time after the buyer discovers or should have discovered the grounds for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

Blakey's delay until the summer of 1980 to notify Euroworld that he would not accept the agreement was not reasonable and should preclude revocation under the Uniform Commercial Code.

10. Blakey has breached his agreement with Euroworld by delivering only two of the eight zero-time 1830 engines he promised. Accordingly, Euroworld is entitled to recover the value of the six "zero time" engines that Blakey has failed to deliver, in accordance with the parties' agreement of October 1, 1979.

11. The value of a zero-time 1830 engine in 1980 was $20,000.

THEREFORE, based upon the above findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court does hereby:

ORDER and ADJUDGE that the plaintiff, EUROWORLD OF CALIFORNIA, INC., shall recover from the defendant, RUDY BLAKEY, $120,000.00, which represents the fair market value of six zero-time 1830 engines in 1980, together with interest thereon as provided by law. This Court does further:

ORDER and ADJUDGE that the plaintiff, EUROWORLD OF CALIFORNIA, INC., shall submit within ten (10) days from the date of this Order, an affidavit setting forth the costs of this action for this Court's review.