**GOLDEN NEEDLES KNITTING AND GLOVE COMPANY, INC., Plaintiff,**

v.

**DYNAMIC MARKETING ENTERPRISES, INC., Defendant.**

**No. ST–C–90–74–P.**

United States District Court, W.D. North Carolina, Statesville Division.

May 10, 1991.

William H. McElwee, III, North Wilkesboro, N.C., for plaintiff.

Joe O. Brewer, Wilkesboro, N.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, District Judge.

THIS MATTER is before the Court on Plaintiff's motion, filed January 24, 1991, for summary judgment in its favor on the complaint and on Defendant's counterclaims. On April 17, 1991, Plaintiff filed a response to the motion. After having considered the arguments made in the motions and the supporting affidavits and exhibits thereto, the Court believes Plaintiff's motion is meritorious and that summary judgment should be granted as a matter of law.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

The facts in this matter indicate that this is a relatively straight-forward contract dispute, governed by Florida's version of the Uniform Commercial Code ("UCC"). Plaintiff, a North Carolina corporation, claims that it manufactured and contracted to sell surgical gloves to Defendant, a Florida corporation. Under an agreement entered into by the parties through an exchange of letters on February 2, 1990, Defendant was to be the exclusive distributor of Plaintiff's product—a prototype, cut-resistant surgical glove designed to protect users from infectious diseases such as AIDS. After approximately $88,934.45 worth of gloves were sent by Plaintiff to Defendant in February and early March, 1990, the agreement on March 13, 1990 was formalized in a writing titled "Exclusive Distributorship Agreement" (hereinafter "agreement"). The agreement was executed in Florida and is governed by laws of that state through a choice of law provision.

On March 14 and 19, 1990, Plaintiff caused to be shipped to Defendant an additional $151,093.18 worth of gloves. Thus, a total of $240,027.63 worth of gloves were sent to Defendant. Because the gloves are considered a medical device, approval from the Federal Food and Drug Administration (FDA) was required prior to the gloves being marketed. The record reveals that the parties disagree who was to obtain such approval. In any event, the approval was not obtained until July 10, 1990.

Defendant contends that the delay in approval caused it difficulties in obtaining financing which in turn resulted in its inability to pay the invoices within thirty (30) days after receiving the gloves as required by the agreement. Defendant has yet to pay the invoice amount or return the gloves to Plaintiff. Defendant sold some of the gloves to Jabour Associates for international distribution, but the record does not indicate if Defendant ultimately sold the remaining gloves or continues to retain those gloves. Defendant also contends that the agreement contemplated that the gloves would arrive sterilized and packaged, ready for distribution. However, Plaintiff delivered the unsterilized gloves in bulk. Furthermore, the record reveals that 700 pairs of gloves arrived with tiny holes. It does appear from the record, however, that Defendant returned those gloves, and Plaintiff promptly replaced them with non-defective gloves.

Plaintiff filed suit for payment of the invoices in the Superior Court for Wilkes County, North Carolina on June 15, 1990. On July 20, 1990, Defendant removed the case to the United States District Court for the Western District of North Carolina, Statesville Division based on diversity jurisdiction. The case was assigned to the Honorable Richard L. Voorhees. Defendant failed to file a timely answer to the complaint resulting in the Clerk signing an Entry of Default on August 23, 1990. On October 30, 1990, Judge Voorhees granted Defendant's motion to set aside the Entry of Default. On November 23, 1990, Defendant filed an answer and counterclaims. Plaintiff, on December 1, 1990, filed a reply to Defendant's counterclaims. On December 14, 1990, the Court denied Plaintiff's first motion for summary judgment. The Court, on December 21, 1990, denied Defendant's motion to transfer this matter to the Middle District of Florida. Thereafter, the summary judgment motion currently before this Court was filed.

## II. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c) of the Federal Rules of Civil Procedure. The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences from the facts in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational factfinder to find for the non-moving party, no genuine issue for trial exists and sum-

mary judgment is appropriate. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE COMPLAINT.

Commercial transactions involving Florida law are governed by that state's version of the UCC. *See* Fla.Stat.Ann. §§ 672.201 et seq.[1]

■ In arguing that summary judgment on the complaint is not appropriate, Defendant first contends that it never accepted the gloves, and thus cannot be held liable for the payment of the invoices. Acceptance of goods under Florida's version of the UCC is covered under Fla.Stat.Ann. § 672.606. That statute provides:

(1) Acceptance of goods occurs when the buyer:

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;

(b) Fails to make an effective rejection (§ 672.602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

When reviewing the facts in this case in the light most favorable to Defendant, the Court must conclude that Defendant accepted the gloves.

Defendant has contended that the gloves were non-conforming under the agreement for the following two reasons: (1) Plaintiff failed to obtain FDA approval to market the gloves; and (2) Plaintiff failed to send the gloves sterilized and pre-packaged. Despite these alleged non-conformities, the Court believes that Defendant nonetheless accepted the gloves as provided in Fla.Stat. Ann. § 672.606(1).[2]

Plaintiff has previously filed the affidavit of its Marketing Manager, Roger Sutton. Mr. Sutton testified that Defendant's President, Victor Ragucci, became aware at a meeting between himself and Mr. Ragucci on February 22, 1990 that FDA approval had not been obtained to market the gloves. *See First Affidavit of Roger Sutton,* filed October 26, 1990, at par. 1 on page 1 (hereinafter "Sutton Aff. I"). Moreover, on August 31, 1990, Defendant filed a motion to set aside the Entry of Default. Attached to that motion is a proposed answer. Paragraph 9 of the proposed answer states, "On or about February 22, 1990, DMD (Defendant's predecessor in interest) and Victor Ragucci *first realized* that FDA had not approved said gloves, and therefore, the gloves were not marketable as they were intended to be sold" (emphasis added).[3]

1. The statute has been recently recodified at Fla.Stat.Ann. § 672.2–201 et seq. in order to be consistent with the codification of the UCC. The Court will refer to the statute utilizing the previous codification; that is without reference to Article 2 of the UCC (i.e., Fla.Stat.Ann. § 672.201 et seq.).

2. Plaintiff vigorously contends that the gloves were conforming. In particular, Plaintiff asserts that it never agreed to obtain approval from the FDA to market the gloves. The evidence before the Court is conflicting on this point. Because the Court is required to view the evidence in the light most favorable to the non-moving party, the Court, for purposes of this motion only, has assumed that Plaintiff was required by the agreement to obtain FDA approval. As is discussed *infra.,* however, that

assumption has no affect on the outcome of Plaintiff's motion. Because the Court has analyzed this matter from the perspective that Plaintiff accepted non-conforming goods and failed to make an effective revocation of acceptance, it is irrelevant for purposes of this motion which party was to obtain FDA approval. Likewise, it is not necessary for the Court to address Defendant's argument that FDA statutes and regulations were violated by Plaintiff's failure to obtain FDA approval.

3. In the answer actually filed November 23, 1990, this sentence is not included. The corresponding paragraph in the answer actually filed is silent as to when Defendant first learned that the gloves did not have FDA approval. Thus, the answer actually filed is not inconsistent with Defendant's proposed answer, but rather, the

Defendant has failed to introduce any evidence to contradict its admission and Plaintiff's assertion that Defendant learned on February 22, 1990 that Plaintiff had not obtained FDA approval to market the gloves. All of the gloves, with the exception of a shipment of $224.00 worth of gloves (which are not at issue in this matter), were shipped after February 22, 1990. Therefore, Defendant knew when it accepted the gloves that Plaintiff had not obtained FDA approval. Accordingly, even if the parties contracted for Plaintiff to obtain FDA approval, Defendant accepted the gloves despite this supposed non-conformity. Hence, Defendant is deemed to have accepted the gloves pursuant to § 672.606(1)(a).[4] *See Euroworld of California, Inc. v. Blakey,* 613 F.Supp. 129, 133 (S.D.Fla.1985) (holding that where buyer had opportunity to inspect goods and failed to inform seller in timely manner of defects, buyer deemed to have accepted goods pursuant to § 672.606), *aff'd,* 794 F.2d 686 (11th Cir.1986).

The Court also believes Defendant accepted the gloves pursuant to § 672.606(1)(b) and § 672.606(1)(c). The record indicates that Defendant at no time rejected the gloves as provided in § 672.606(1)(b). Instead, Defendant at most (as discussed *infra.*) attempted to revoke acceptance of the gloves. As to § 672.606(1)(c), Defendant admits it retained the gloves and benefitted by selling some of those gloves to Jabour Associates for international distribution. *See Defendant's Response,* filed April 17, 1991, at 6–7. Therefore, Defendant acted inconsistently with Plaintiff's ownership of the

gloves and is deemed to have accepted the gloves pursuant to § 672.606(1)(c). Accordingly, Defendant "[m]ust pay at the contract rate for any goods accepted". *See* Fla.Stat.Ann. § 672.607(1); *see also B.P. Development and Management Corp. v. P. Lafer Enterprises, Inc.,* 538 So.2d 1379, 1381 (Fla.Ct.App.1989).

Under Florida's version of the UCC, "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured ...". *See* Fla.Stat.Ann. § 672.607(2); *see also B.P. Development,* 538 So.2d at 1381. Paragraph 2 of the Official Comment of § 672.607(2) provides:

2. Under subsection (2) acceptance of goods precludes their subsequent rejection. Any return of the goods thereafter must be by way of revocation of acceptance under the next section. Revocation is unavailable for a non-conformity known to the buyer at the time of acceptance, except where the buyer has accepted on the reasonable assumption that the non-conformity would be seasonably cured.

The burden is on Defendant to establish any breach with respect to the goods accepted. *See* Fla.Stat.Ann. § 672.607(4). Because Defendant accepted the gloves, the only basis for revoking that acceptance is pursuant to § 672.608.

■ Fla.Stat.Ann. § 672.608 provides in pertinent part:

---

proposed answer is more complete regarding the details of when Defendant first learned that FDA approval had not been obtained. Furthermore, the affidavit of Mr. Ragucci does not state when Defendant first learned that FDA approval had not been obtained. *See Affidavit of Victor Ragucci,* filed December 17, 1990 at third page (hereinafter "Ragucci Aff.").

4. With regard to Defendant's argument that the gloves did not conform because they were unsanitized and shipped in bulk, the Court believes that Defendant accepted the gloves despite these supposed non-conformities. Victor Ragucci indicated in his affidavit that he was aware of the conditions of the gloves. "[W]hen the gloves

arrived, they came packaged in bulk, and were not only un-sterile, but were actually completely contaminated...." Ragucci Aff. at third page. Defendant was immediately aware that the gloves were unsanitized and not pre-packaged. Yet, Defendant accepted the gloves in spite of their alleged nonconformity.

Any argument that the gloves were non-conforming because 700 pairs contained holes is not meritorious. The record is clear that Defendant returned these gloves to Plaintiff, who replaced them with non-defective gloves. *See Supplemental Affidavit of Roger Sutton,* filed on January 24, 1991, at 4 (hereinafter "Sutton Aff. II"). Defendant has failed to produce any evidence to the contrary.

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:

(a) On the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) Without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

The Court is required to view the evidence in the light most favorable to Defendant. Defendant has introduced deposition testimony that indicates that Plaintiff agreed to cure the nonconforming goods by obtaining FDA approval. In Mr. Ragucci's deposition, Defendant appears to concede that it accepted the goods but intended to revoke that acceptance pursuant to § 672.608. "It was and is my and DME's (Defendant's) understanding that the gloves have only been conditionally accepted, subject to the Plaintiff's cure of the defects and outstanding impediments to marketing of same." Moreover, Defendant has introduced a letter dated May 11, 1990 from its attorney to Plaintiff's President stating, "As you know, your company sold gloves to Mr. Ragucci which were not marketable at the time of sale and continue to be nonmarketable until FDA approval is given". Thus, when viewed in the light most favorable to Defendant, it appears to the Court that Defendant attempted on May 11, 1990 to revoke the acceptance of the gloves—only several months after accepting the goods. Contrary to Plaintiff's arguments, the Court believes that the attempted revocation was timely. *See Bair v. A.E.G.I.S.*

*Corp.*, 523 So.2d 1186, 1189 (Fla.Ct.App.), *review denied*, 531 So.2d 1355 (Fla.1988); *Hikes v. McNamara Pontiac, Inc.*, 510 So.2d 1212, 1214 (Fla.Ct.App.1987).

Nonetheless, the Court believes that the attempted revocation was deficient as a matter of law. Section 672.608 provides that revocation of acceptance is not effective until the buyer notifies the seller. *See Euroworld of California*, 613 F.Supp. at 134; *B.P. Development*, 538 So.2d at 1381; *Central Florida Antenna Service v. Crabtree*, 503 So.2d 1351, 1353 (Fla.Ct.App. 1987). The statute does not explicitly provide what must be contained in the notice of revocation, nor is the Court aware of Florida cases interpreting what must be contained in the notice. However, Paragraph 5 of the Official Commentary of the statute states:

The content of the notice under subsection (2) is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment. *More will generally be necessary than the mere notification of breach required under the preceding section....* Following the general policy of this Article, the requirements of the content of notification are less stringent in the case of a nonmerchant buyer (emphasis added).

What is clear from Comment 5 is that the content of the notice for rejection is not as stringent as that for revocation of acceptance.[5] Mere notice under § 672.607(3)(a) is not sufficient. *See* White & Summers, Uniform Commercial Code, Hornbook Series, at § 8–4 on page 421 (West 3rd ed. 1988) (hereinafter "White & Summers"). The notice requirement is a valid precondition prior to imposing liability on the seller. *See General Matters, Inc. v. Paramount Canning Co.*, 382 So.2d 1262, 1263 (Fla.Ct.App.1980). Not every expression of discontent by the buyer always satisfies the notice requirement. *See Eastern Air Lines, Inc. v. McDonnell Douglas*

---

**5.** The provision referred to in Comment 5 is found at § 672.607(3)(a). That statute provides: Where a tender has been accepted the buyer must within a reasonable time after he dis-

covers or should have discovered any breach notify the seller of breach or be barred from any remedy....

*Corp.*, 532 F.2d 957, 977 (5th Cir.1976) (holding that as matter of law cursory letter from buyer to seller did not provide sufficient notice). The notice must "set forth the nonconformity in the goods materially impairing their value to the buyer". *See White & Summer* at 422 (quoting *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 327 A.2d 502 (1974)). The notice must also inform the seller that the buyer does not wish to keep the goods. *See White & Summer* at 422. Moreover, if the buyer equivocates in word or in deed, his purported revocation will very likely be invalid. *Id.* Furthermore, a merchant is held to a higher standard than ordinary buyers. *See Eastern Air Lines*, 532 F.2d at 977.[6] And the buyer bears the burden in showing that he gave the required notice within a reasonable time. *Cf. Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir.1983); *General Matters, Inc.*, 382 So.2d at 1263.

As previously noted, the notice requirement under § 672.608(2) is more stringent than that of § 672.607(3). With that in mind, the Court believes that Defendant's attempted notice of revocation was deficient as a matter of law. The only evidence presented by Defendant was the letter dated May 11, 1990 from its attorney to Plaintiff's President stating, "As you know, your company sold gloves to Mr. Ragucci which were not marketable at the time of sale and continue to be nonmarketable until FDA approval is given". Obviously, the letter fails to state in sufficient detail the reason for the revocation. Moreover, Defendant's subsequent activities following the letter being sent indicate that it did not intend to revoke acceptance. Defendant never attempted to return the gloves or indicated to Plaintiff that it desired to return the gloves. *See Sutton Aff. II* at par. 12 on page 4. To the contrary, Defendant retained the gloves and actively worked at obtaining FDA approval to market the gloves. *See Ragucci Aff.* at third page.

The Court finds as a matter of law Defendant failed to effectively revoke its acceptance pursuant to § 672.608. Plaintiff's motion for summary judgment in its favor on the complaint will therefore be granted. Defendant must pay to Plaintiff the contract rate of $240,027.63 for the gloves accepted. *See* Fla.Stat.Ann. § 672.607(1).

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS.

Defendant, in its answer, has alleged seven (7) counterclaims. The Court will discuss each below.

The first counterclaim states that Defendant is entitled to specific performance of the agreement between the parties. The Court believes that specific performance on the contract is not available because the contract was voided by Defendant's failure to perform. Under the agreement, Defendant was required to pay the invoices within thirty (30) days of the gloves being shipped. Because the last gloves were shipped on March 19, 1990, Defendant should have tendered payment no later than April 18, 1990.[7] The failure

---

**6.** Defendant has made the argument that since the company was new it should not be considered a merchant. Such an argument is undermined in light of a letter written by its President, Victor Ragucci, to Plaintiff's Marketing Manager, Roger Sutton, on December 20, 1989. In that letter, Ragucci states, "Dynamic Medical (the predecessor of Defendant) has presently dealers in Massachusetts, Michigan, and California, promoting our quality latex glove lines". *See* Sutton Aff. II at exhibit 1. The letter demonstrates that Victor Ragucci, the alter-ego of Defendant, had extensive experience distributing goods similar to the ones manufactured by Plaintiff. Therefore, the Court finds that Defendant, through Ragucci, was a merchant for purposes of the UCC.

**7.** Defendant argues that the agreement gives the parties sixty (60) days to cure failures to perform once written notice has been given. In this case, Plaintiff notified Defendant by letter on May 7, 1990 that it was in breach of the agreement. In acknowledging the letter, Defendant's C.E.O., Douglas Markley, on May 15, 1990 stated:

> In closing, let me say that, having reviewed our contract, I fully understand the necessity for you to have sent your May 7 letter as our formal notification of deficiency, in order to start the 60–day clock on our grace period for cure. Were I in your position, I would have done the same. But I hope I have made clear that we fully intend to honor our obligations

of Defendant to pay the invoices was a terminable act under the agreement. Therefore, Plaintiff was justified in terminating the agreement either on April 18, 1990 or July 6, 1990. Accordingly, there is no longer an agreement that can be enforced through specific performance. *See Molina v. Reiss,* 254 So.2d 853, 854 (Fla.Ct. App.1971).[8] The Court is required to grant Plaintiff's motion for summary judgment on this counterclaim.

■■■■ The second counterclaim alleged by Defendant is that Plaintiff breached the agreement. As previously noted, the Court believes Defendant accepted the gloves, and then failed to make an effective revocation of the acceptance. The UCC contemplates and approves of the practice that parties may change the terms of the original agreement. When a buyer accepts non-conforming goods and fails to effectively revoke that acceptance, the UCC does not treat the shipment of those goods as a breach by the seller. Rather, the buyer "[m]ust pay at the contract rate for any goods accepted". *See* Fla.Stat.Ann. § 672.607(1); *see also B.P. Development and Management Corp.,* 538 So.2d at 1381. Therefore, summary judgment is appropriate on this counterclaim.

[17] The third counterclaim brought by Defendant alleges that Plaintiff tortiously interfered with the agreement between itself and Defendant by procuring third parties to enter into agreements with Plaintiff to distribute the gloves. Such facts, had they been properly pleaded, may have constituted a breach of Defendant's contractual rights to be the exclusive distributor of the gloves. However, Defendant failed to plead these facts as a breach of contract and instead pleaded the facts as the tort of interference with the contract. As a matter of law, a party to the contract cannot be held liable for tortiously interfering with a contract to which it is a party—a third party must be involved. *See United of Omaha Life Insurance Co. v. Nob Hill Associates,* 450 So.2d 536, 539 (Fla.Ct. App.), *review denied,* 458 So.2d 274 (Fla. 1984).[9] Therefore, summary judgment must be granted on this counterclaim.

■■■■ Defendant has contended in its fourth counterclaim that it is entitled to an injunction in order to enforce its exclusive distributor rights. As stated with regard to Defendant's first counterclaim, the Court believes that Plaintiff was justified in terminating the agreement when Defendant failed to cure its breach.[10] Therefore,

---

and to move ahead with you to build a solid and mutually profitable relationship.
*See Sutton Aff. I,* at exhibit 6.
Even if the cure period is applicable to the provision of the agreement requiring payment within thirty (30) days, Defendant should have paid the invoices by July 6, 1990. It failed to do so. Thus, Plaintiff was justified in terminating the agreement.

8. The Court also believes that Defendant, as a buyer that has failed to make required payments under the agreement, is not entitled to utilize the remedy of specific performance. *See Hooper v. Breneman,* 417 So.2d 315, 317 (Fla.Ct. App.1982). Moreover, a buyer seeking specific performance must demonstrate that it is ready, willing, and able to tender payment. *See Darden v. Houtz,* 234 F.Supp. 261, 270 (E.D.N.C. 1964), *aff'd,* 353 F.2d 369 (4th Cir.1965). Defendant has failed to make such a showing.

9. The only argument raised by Defendant to counter Plaintiff's arguments that summary judgment should be granted on the third counterclaim is that it should be permitted to amend its counterclaim to allege that Plaintiff's Presi-

dent personally interfered with the contract. The Court believes that such an amendment would still fail to correct the defect in this counterclaim. Even if Plaintiff's President interfered with the contract, Defendant's tortious interference claim would lie against him and not Plaintiff itself. Plaintiff's President is not a party to this action, nor has Defendant moved to add him as a party.

10. Defendant appears to contend that Plaintiff's action in filing this lawsuit released it of its obligation to tender payment. The Court believes such a contention is erroneous. The agreement does not contain a provision that relieves Defendant of its obligations to make payments for goods received if Plaintiff initiates a lawsuit to recover such payments. The agreement only provides the parties with a sixty (60) day period to cure breaches. However, this provision does not prohibit a party from initiating an action prior to the expiration of the cure period. Had Defendant tendered payment prior to expiration of the cure period, Plaintiff's action would have been subject to dismissal. In such a scenario, the breach by Defendant would have been deemed cured.

summary judgment is appropriate on this counterclaim.

The fifth counterclaim alleges that Plaintiff shipped gloves that violated an implied warranty of merchantability. As the Court has previously noted, Defendant accepted non-conforming goods and then failed to effectively revoke that acceptance. When Defendant became aware that FDA approval had not been obtained and that the gloves had been shipped unsterilized in bulk, its remedy was to revoke its acceptance. Having failed to do so, Defendant cannot by-pass the UCC provision regarding revocation of acceptance by claiming that the non-conforming gloves it knowingly accepted violated an implied warranty. Accordingly, summary judgment should be granted concerning this counterclaim.

Defendant contends in its sixth counterclaim that Plaintiff committed unfair and/or deceptive trade practices violative of Fla.Stat.Ann. §§ 501.201 et seq. As a matter of law, the Court believes that the statute is limited to "consumer transactions", and not to sophisticated commercial transactions such as in the matter presently before the Court. The statute is not intended to protect parties such as Defendant that have substantial previous experience in such transactions. *See Black v. Department of Legal Affairs*, 353 So.2d 655, 656 (Fla.Ct.App.1977) (holding that purpose of statute is to protect unwary consumers). The Court believes there is no genuine issue of material fact in dispute regarding the experience of the President of Defendant in transactions such as the one in this case. *See supra.* note 6 and accompanying text. Thus, the Court will grant Plaintiff's motion for summary judgment on this counterclaim.

In the seventh and final counterclaim, Defendant requests that punitive damages be awarded to it. As an initial matter, the Court believes that the record in this case demonstrates that this matter primarily involves a contract dispute. Punitive damages are not available under Florida law for breach of contract. *See John Brown Automation, Inc. v. Nobles*, 537 So.2d 614, 617 (Fla.Ct.App.1988) (citing

plethora of cases), *review denied*, 547 So.2d 1210 (Fla.1989). Moreover, the Court has granted Plaintiff's motion for summary judgment on Defendant's only tort counterclaim—tortious interference of contract. The Court, therefore, believes that summary judgment in favor of Plaintiff should be granted on this counterclaim.

## V. PLAINTIFF'S MOTION FOR COSTS AND ATTORNEY'S FEES.

The Court has carefully reviewed Plaintiff's motion that the Court award to it costs and attorney's fees. Although the Court believes that summary judgment in favor of Plaintiff on its complaint and Defendant's counterclaims is warranted, the Court does not believe that the position taken by Defendant in this litigation was so egregious and indefensible to warrant granting Plaintiff's motion. The Court does not believe that the interest of justice would be served by awarding to Plaintiff its costs and attorney fees. Accordingly, the Court will deny Plaintiff's motion.

## VI. ORDER OF THE COURT.

NOW, THEREFORE, IT IS ORDERED that:

(1) Plaintiff's motion for summary judgment in its favor on the complaint be, and hereby is, GRANTED;

(2) Plaintiff's motion for summary judgment in its favor on Defendant's counterclaims be, and hereby is, GRANTED; and

(3) Plaintiff's motion for its costs and attorney's fees be, and hereby is, DENIED.